CWT FARMS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CWT INTERNATIONAL, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 16365–80, 16367–80.     Filed December 23, 1982.

---

*W. Woodrow Stewart, T. Treadwell Syfan,* and *Steven A. Cornelison,* for the petitioners.
*Bettie N. Ricca,* for the respondent.

## SUPPLEMENTAL OPINION

SIMPSON, *Judge*: On July 19, 1982, this Court filed its findings of fact and opinion in this case (79 T.C. 86), in which we held that petitioner CWT International, Inc. (International), did not qualify as a domestic international sales corporation (DISC) for its taxable years ending in 1975, 1976, and 1977. Our holding was based on the conclusion that certain loans from International to petitioner CWT Farms, Inc. (Farms), were not "producer's loans" under section 993(d) of the Internal Revenue Code of 1954,[1] and that, therefore, such loans were not qualified export assets within the meaning of section 993(b). As a result, International failed to satisfy the requirement that 95 percent of the assets of a DISC must be qualified export assets. Sec. 992(a)(1)(B). In view of that conclusion, we found it unnecessary to decide whether certain commissions receivable held by International were qualified export assets. 79 T.C. at 93, 95. Decisions were to be entered pursuant to Rule 155, Tax Court Rules of Practice and Procedure,[2] and they have not yet been entered.

The petitioners have made a timely motion for reconsideration of our opinion in which they requested us to decide whether the commissions receivable constituted qualified export assets. The Commissioner filed a notice of objection to petitioners' motion and a supporting memorandum. For the reasons set forth in this Supplemental Opinion, we grant the petitioners' motion and decide the commissions issue.

Generally speaking, when a corporation which purports to be a DISC for a taxable year is determined not to have qualified as a DISC in that year for failure to meet the assets

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

[2] All references to a Rule are to the Tax Court Rules of Practice and Procedure.

test, the corporation may gain DISC status for that year if it makes a deficiency distribution to its shareholders with respect to their stock. Sec. 992(c)(1). Such distribution must be in an amount equal to the fair market value of those assets which are not qualified export assets on the last day of such taxable year. Sec. 992(c)(1)(B). The right to make such a deficiency distribution is not automatic. The corporation must demonstrate that both its failure to meet the assets test and its failure to make the deficiency distribution prior to the date on which it is made were due to reasonable cause. Sec. 992(c)(2)(A). Furthermore, if the distribution occurs more than $9\frac{1}{2}$ months after the close of the taxable year with respect to which it is made, the corporation must pay interest to the Commissioner. Sec. 992(c)(2)(B). Section 992(c) specifies that the distribution must be made after the close of the taxable year to which it relates, but such section does not prescribe a time period within which the distribution must be made. However, section 1.992–3(c)(3), Income Tax Regs., provides that the distribution must be made within 90 days "from the date of the first written notification to the corporation by the Internal Revenue Service that it had not satisfied * * * the 95 percent assets test * * * for a taxable year." In any case where the corporation contests the determination of the IRS in the Tax Court, the 90-day period is extended until 30 days after the Tax Court's decision becomes final. Sec. 1.992–3(c)(3)(i), Income Tax Regs. A Tax Court decision will generally become final 90 days after the decision is entered unless a notice of appeal is filed within that time. Secs. 7481(a)(1), 7483.

In the motion for reconsideration, International indicated that it contemplates making a deficiency distribution in an attempt to qualify as a DISC for its taxable years ending in 1975, 1976, and 1977. Since the amount of such distribution is measured by the value of its nonqualified assets, International seeks a determination of how much of its property was not qualified. International requests that we reconsider our opinion and decide whether the commissions receivable were qualified export assets for its taxable years ending in 1975, 1976, and 1977, so that it may distribute the proper amount.

The Commissioner urges that we deny the petitioners' motion for reconsideration. In support of his position, the Commissioner argues that International waived its right to

make a deficiency distribution by failing to assert such right prior to the filing of this Court's opinion. The Commissioner also argues that the petitioners have not demonstrated that reconsideration would affect the outcome of the case.

The decision of whether to grant a motion for reconsideration of an opinion rests within the discretion of the Court. Reconsideration of proceedings already concluded is generally denied in the absence of substantial error or unusual circumstances. *Haft Trust v. Commissioner*, 62 T.C. 145 (1974), affd. on this issue 510 F.2d 43, 45 n. 1 (1st Cir. 1975). It is the policy of this Court to try all the issues raised in a case in one proceeding to avoid piecemeal and protracted litigation. We will generally not grant reconsideration to resolve issues which could have been raised during the prior proceedings (*Stoody v. Commissioner*, 67 T.C. 643 (1977); *Haft Trust v. Commissioner, supra*) because "The parties cannot try their cases with hindsight" (*Long v. Commissioner*, 71 T.C. 724, 727 (1979), remanding on another issue 660 F.2d 416 (10th Cir. 1981)). However, in this situation, the issue of whether the commissions receivable were qualified export assets was tried and has been briefed by the parties. Although we considered it unnecessary to decide such issue in our initial opinion, the petitioners have presented persuasive reasons for doing so at this time.

The Commissioner's contention that International waived its right to make a deficiency distribution by failing to assert such right prior to the filing of the Court's opinion is refuted by section 1.992–3(c)(3), Income Tax Regs. This section clearly provides that such distributions may be made within 30 days after the time a Tax Court decision becomes final. Congress intended that a corporation could first litigate the issue of DISC status for a taxable year and then make a deficiency distribution if necessary:

It is understood that the regulations will provide that * * * the period for making the distribution is to be extended in any case where the corporation contests the determination of the Service in the Tax Court. [H. Rept. 92–533 (1971), 1972–1 C.B. 498, 532.]

In addition, no provision in section 992(c) or in section 1.992–3(c)(3) requires that a corporation must assert, prior to the filing of our opinion, its intention to make a deficiency distribution should this Court determine that the corporation

was not a DISC for a taxable year. In fact, the language of the committee report, as well as the provisions of section 992(c), strongly suggests a contrary result. A necessary condition to a deficiency distribution under section 992(c) is that the failure to have made such distribution earlier was due to reasonable cause. In some situations, it may be impossible to determine whether such requirement has been satisfied until after the distribution is made. No corporation which is litigating its DISC status in the Tax Court will make such a distribution until the Tax Court determines that the corporation was not a DISC during the years at issue. Therefore, the question of whether a corporation has complied with the conditions of section 992(c), and thus attained DISC status in that manner, will usually not arise until after this Court has determined that such corporation was not a DISC in the first instance. The distribution issue is not "ripe" prior to the filing of our opinion. Compare *Adams v. Commissioner*, 72 T.C. 81 (1979), affd. without published opinion 688 F.2d 815 (2d Cir. 1982). Section 992(c) and its regulations do not require that the issue be raised prior to that time. This Court will not impose such a requirement when neither Congress nor the Commissioner has done so. Thus, we conclude that International has not waived its rights under section 992(c) merely by failing to indicate prior to this time that it would seek to utilize that section.

It is clear that International, if it satisfies the other conditions of section 992(c), may yet establish that it was a DISC for its taxable years ending in 1975, 1976, and 1977. The Commissioner's contention that our reconsideration of the opinion would not affect the outcome of the case is also without merit.[3]

Section 992(c) and its accompanying regulations provide no procedure for determining whether a deficiency distribution meets the requirements of such section and thus qualifies the distributing corporation as a DISC. Section 1.992–3(c)(3) of the regulations purports to allow a deficiency distribution to be made within 30 days after our decision concerning DISC status

---

[3]The Commissioner also argued that our resolution of the commissions issue will not fully determine the amount of nonqualified assets because the Commissioner also challenged the qualified status of interest receivables held by International. The petitioners' brief apparently conceded that the interest receivables were not qualified assets. Hence, we need not, and do not, decide whether the interest receivables were qualified export assets.

has become final. However, once the decision becomes final, we ordinarily have no jurisdiction to vacate, modify, or reconsider it. *Anderson v. Commissioner,* an unreported case (9th Cir. 1979, 43 AFTR 2d 79–728, 79–1 USTC par. 9233), affg. an order of this Court; *Lasky v. Commissioner,* 235 F.2d 97 (9th Cir. 1956) (dismissing appeal from Tax Court[4]), affd. per curiam 352 U.S. 1027 (1957). Thus, if International puts off making a deficiency distribution until after our decisions become final, this Court will be unable to recompute the petitioners' deficiencies based on International's claim that it qualified as a DISC by virtue of such deficiency distribution. To utilize the option which Congress clearly intended it to have under section 992(c), International must both make a distribution and litigate its validity *before* our decision becomes final.

Since International has expressed an intention to make a deficiency distribution, we are convinced that it is appropriate for us now to decide whether International's commissions receivable constituted qualified export assets for the taxable years in issue. We emphasize that we are *not* now deciding whether a distribution hereafter made by International will qualify as a deficiency distribution under section 992(c) sufficient to cause International to be treated as a DISC for its taxable years ending in 1975, 1976, and 1977. Such a determination must necessarily await International's attempt to comply with the requirements of section 992(c). At that time, we can decide whether the reasonable cause requirements of such provision have been satisfied.

The issue for decision is whether the commissions receivable, representing sales commissions owed to International by Farms, held by International on the last day of each of its taxable years in issue, constituted qualified export assets. Resolution of this issue requires that we determine the validity of section 1.993–2(d)(2), Income Tax Regs.

Many of the facts necessary to our decision were found in *CWT Farms, Inc. v. Commissioner,* 79 T.C. at 88–89. International acted solely as a commission agent for items exported by Farms. The taxable years of both Farms and International

---

[4] 14 T.C.M. 953, 24 P-H Memo T.C. par. 55,254-A (1955), vacating 22 T.C. 13 (1954).

ended on September 30. International filed its domestic international sales corporation return (Form 1120-DISC) for each of the taxable years in issue. On Schedule L (balance sheets) of such returns, International listed as "Nonqualified assets" the "Commissions and Interest Receivable" held by it on the last day of the taxable year. International did *not* list these items on the line marked "Trade receivables (accounts and notes receivable)" under the "Qualified asset" heading.

During the years in issue, International received the following commissions from Farms:

| Year ended Dec. 30— | Amount | Date paid |
|---|---|---|
| 1975 | $157,538.33 | 12/15/75 |
| 1976 | 145,440.77 | 12/ 8/76 |
| 1977 | 116,142.53 | 12/20/77 |

The Commissioner determined that International's commissions receivable were not qualified export assets.

Qualified export assets are enumerated and defined in section 993(b). This section does not expressly include "commissions receivable" within its definition of qualified export assets. See sec. 993(b)(3). However, section 1.993–2(d)(2), Income Tax Regs., provides that commissions receivable may, under certain circumstances, constitute qualified export assets.

Section 1.993–2(d)(2), Income Tax Regs., provides, in pertinent part:

If a DISC acts as commission agent for a principal in a transaction * * * which results in qualified export receipts for the DISC, and if an account receivable * * * held by the DISC and representing the commission payable to the DISC as a result of the transaction arises * * * , such account receivable * * * shall be treated as a * * * [qualified export asset]. If, however, the principal is a related supplier * * * with respect to the DISC, such account receivable * * * will not be treated as a * * * [qualified export asset] unless it is payable and paid in a time and manner which satisfy the requirements of sec. 1.994–1(e)(3) * * *

Section 1.994–1(e)(3)(i) provides, in pertinent part:

The amount of * * * a sales commission (or reasonable estimate thereof) actually charged by a DISC to a related supplier * * * must be paid no later than 60 days following the close of the taxable year of the DISC during which the transaction occurred.

Since Farms owned 100 percent of International's stock during

the years in issue, Farms was a related supplier with respect to International. See secs. 1.482–1(a), 1.994–1(a)(3), Income Tax Regs. Thus, the 60-day rule applied to International's commissions receivable, and since in no year were the commissions receivable timely paid, those receivables were not qualified export assets within the meaning of the regulations.

The petitioners challenge the validity of the regulations containing the 60-day rule. They argue that the requirement that commissions receivable owed by a related person must be paid within 60 days after the close of the DISC's taxable year in order to be qualified is found neither in section 993 nor section 994. Accordingly, they assert that the regulations issued under these sections may not add such condition when the statutes do not impose it. The petitioners also contend that the regulations containing the 60-day rule are an unreasonable interpretation of sections 993 and 994. Finally, they contend that, in any event, since section 1.993–2(d)(2) of the regulations was not issued until October 14, 1977, such regulation cannot be retroactively applied to International for the taxable years in issue, the last of which ended on September 30, 1977.

Section 7805(a) authorizes the Secretary of the Treasury (or his delegate, the Commissioner (see sec. 301.7805–1(a), Proced. & Admin. Regs.)) to "prescribe all needful rules and regulations for the enforcement of" the revenue statutes. The judicial role in assessing the validity of a challenged regulation is necessarily a limited one. This Court ordinarily defers to the Commissioner's interpretive regulations because "Congress has delegated to the Commissioner, not to the courts, the task of prescribing" such regulations (*Commissioner v. Portland Cement Co. of Utah*, 450 U.S. 156, 169 (1981); *National Muffler Dealers Ass'n, Inc. v. United States*, 440 U.S. 472, 477 (1979); *United States v. Correll*, 389 U.S. 299, 307 (1967)), and because such regulations represent contemporaneous constructions by those charged with the administration of the revenue statutes (*Bingler v. Johnson*, 394 U.S. 741, 750 (1969); *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948)). Our inquiry is generally limited to the question whether the regulation implements the congressional mandate in some reasonable manner (*National Muffler Dealers Ass'n, Inc. v. United States, supra* at 476;

*United States v. Correll, supra*), or in other words, whether the challenged regulation harmonizes with the plain language of the statute, its origin, and purpose (*National Muffler Dealers Ass'n, Inc. v. United States, supra* at 477).

On the other hand, judicial deference is not a substitute for judicial scrutiny and analysis. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16 (1982). A regulation which contradicts the unambiguous language of the statute it purports to interpret cannot stand. *Citizen's National Bank of Waco v. United States*, 417 F.2d 675 (5th Cir. 1969); *Gresham v. Commissioner*, 79 T.C. 322, 331 (1982). Moreover, where the statute is unambiguous, and there is no valid reason for adding a requirement to those the statute already provides, the Commissioner may not usurp congressional authority by adding such a requirement by regulation. *Estate of Boeshore v. Commissioner*, 78 T.C. 523 (1982); *Arrow Fastener Co. v. Commissioner*, 76 T.C. 423 (1981); *BBS Associates, Inc. v. Commissioner*, 74 T.C. 1118, 1131–1132 (1980), affd. in unpublished opinion (3d Cir., July 29, 1981); *Caterpillar Tractor Co. v. United States*, 218 Ct. Cl. 517, 526, 589 F.2d 1040, 1045 (1978). Finally, although a regulation does not clearly contradict or limit the provisions of the statute it purports to interpret, it is nonetheless invalid if it is inconsistent with the statute's origin and purpose. *United States v. Vogel Fertilizer Co., supra.*

The language of section 993(b)(3) is anything but unambiguous. Section 993(b) provides in relevant part:

the qualified export assets of a corporation are—

\* \* \* \* \* \* \*

(3) accounts receivable \* \* \* which arise by reason of transactions of such corporation \* \* \* described in subparagraph (A), (B), (C), (D), (G), or (H), of subsection (a)(1);

The transactions described in such subparagraphs are:

(A) \* \* \* the sale, exchange, or other disposition of export property,

(B) \* \* \* the lease or rental of export property, which is used by the lessee of such property outside the United States,

(C) \* \* \* services which are related and subsidiary to any qualified sale, exchange, lease, rental, or other disposition of export property by such corporation,

(D) \* \* \* the sale, exchange, or other disposition of qualified export assets (other than export property),

\*     \*     \*     \*     \*     \*     \*

(G) * * * engineering or architectural services for construction projects located (or proposed for location) outside the United States, and

(H) * * * the performance of managerial services in furtherance of the production of other qualified export receipts of a DISC.

Section 993(f) defines gross receipts and provides, in part, "In the case of commissions on the sale, lease, or rental of property, the amount taken into account for purposes of this part as gross receipts shall be the gross receipts on the sale, lease, or rental of the property on which such commissions arose." Section 994 deals with "inter-company pricing rules," and subsection (a) sets forth rules for determining the price that may be charged when a related person makes a sale to a DISC. If such rules are used, the Commissioner may not reallocate income between the related person and the DISC under section 482. Section 994(b) authorizes the Secretary to prescribe regulations setting forth "rules which are consistent with the rules set forth in subsection (a) for the application of this section in the case of commissions."

In other words, section 993(b)(3) provides qualified asset treatment for a DISC's accounts receivable arising out of transactions (e.g., sales) "of such corporation"; a DISC which functions as a commission agent has no sales. In using the term "accounts receivable" in section 993(b)(3), Congress may have intended to include only those accounts receivable owed to the DISC for sales *it* made, or owed to the principal, but purchased and held by the DISC, for sales made by the principal where the DISC functioned solely as commission agent. Such interpretation is suggested by the House and Senate committee explanations of section 993(b)(3):

The types of assets classified as qualified export assets are—

\*     \*     \*     \*     \*     \*     \*

(3) accounts receivable * * * of the corporation (*or if the corporation acts as agent, the principal*) held by the corporation which arose in connection with qualified export sale * * * transactions * * * [H. Rept. 92–533 (1971), 1972–1 C.B. 498, 533; S. Rept. 92–437 (1971), 1972–1 C.B. 559, 614. [Emphasis added.]

In short, the express reference to commissions in sections 993(f) and 994(b) reveals that Congress certainly had in mind that commission arrangements might be used in sales involving DISCs, but it is not at all clear that the reference to

accounts receivable in section 993(b)(3) was intended to include commissions receivable owed by a production company to a related DISC acting as selling agent. See DISC - A Handbook for Exporters, excerpted in Announcement 72–23, 1972–1 C.B. 679, 685 (illustrative example in H(3)).

No party to this case argues that such commissions receivable cannot constitute qualified export assets under section 993(b)(3). The petitioners assert that, in applying the 60-day payment requirement in the case of commissions receivable owed by a related producer, section 1.993–2(d)(2) of the regulations adds to section 993(b)(3) a limitation which Congress did not require. Thus, the petitioners conclude, the regulation limits the applicability of the statute and is invalid. However, the extent to which Congress intended commissions receivable owed by the producer to the related DISC to constitute qualified export assets is unclear. In light of the statute's ambiguity and imprecision, the challenged regulation can in no way be said to contradict or limit the "unambiguous" language of section 993(b)(3).

The petitioners rely on *Arrow Fastener Co. v. Commissioner*, *supra*, and *Caterpillar Tractor Co. v. United States*, *supra*, both invalidating DISC regulations, but those decisions are distinguishable from the present case. In *Arrow Fastener*, this Court invalidated an income tax regulation which limited the extent to which Export-Import Bank obligations could constitute qualified export assets. Section 993(b)(7) specified that such obligations were qualified export assets and provided no limitation on the amount of such obligations that could qualify. We found the statute clear and unambiguous and held the regulation invalid, because "respondent has no power to promulgate a regulation adding provisions that he believes Congress should have included." 76 T.C. at 431. Likewise, in *Caterpillar Tractor*, the Court of Claims invalidated a regulation which excepted property sold by a DISC to a related Western Hemisphere Trade Corporation from the definition of "export property" in section 993(c). The court found that the regulation added a requirement not found in section 993(c) and held that the regulation "being contrary to the plain language of the statute, cannot stand." 218 Ct. Cl. at 531, 589 F.2d at 1048. In the present case, section 993(b)(3) leaves unclear the extent to which commissions receivable constitute qualified

export assets. The challenged regulation does not contradict the "plain language" of section 993(b)(3). At most, the regulation interprets the ambiguous language of section 993(b)(3) to include commissions receivable within the definition of qualified accounts receivable in certain situations.

Our inquiry must be directed solely to whether the challenged regulation is a reasonable interpretation of section 993(b)(3); in other words, whether the regulation harmonizes with the origin and purpose of the DISC statutes. We conclude that the regulation is valid.

The DISC legislation was intended to encourage domestic corporations to produce in the United States for export. See H. Rept. 92-533, *supra*, 1972-1 C.B. at 503, 529. However, Congress was concerned that tax-deferred DISC profits[5] might be used by the DISC's parent (usually the export producer) for purposes unrelated to exporting. See Surrey, Summary of Arguments Against DISC Proposal, 117 Cong. Rec. 41722 (Nov. 17, 1971). For this reason, Congress attempted to ensure that loans from a DISC to a producer are used only to encourage exporting. See R. Feinschreiber, Domestic International Sales Corporations 9-10 (1978); 1 R. Rhoades, Income Taxation of Foreign Related Transactions 4-112, 4-181—4-186 (1982). The DISC legislation attempts to accomplish this objective by limiting the amount of such loans which may constitute qualified export assets. A loan to a producer is a "producer's loan" (sec. 993(d)) and thus a qualified export asset (sec. 993(b)(5)) only to the extent that it does not exceed the amount of the borrower's assets considered as being related to the borrower's export sales (sec. 993(d)(2)). In addition, such a loan is a producer's loan only to the extent that it does not exceed the amount of the borrower's increased investment in export-related assets during the year. Sec. 992(d)(3); sec. 1.993-4(c)(1), Income Tax Regs.; see generally H. Rept. 92-533, *supra*, 1972-1 C.B. at 535-536; R. Feinschreiber, *supra* at 132-139. The DISC legislation clearly reflects a congressional policy to limit qualified producer loans in order to ensure that tax-deferred DISC profits are used solely for exporting.

---

[5]See our prior opinion for a general explanation of the DISC taxing scheme. *CWT Farms, Inc. v. Commissioner*, 79 T.C. 86, 90-91 (1982). See also R. Feinschreiber, Domestic International Sales Corporations 9-10 (1978).

The limitations on the amounts of qualified producer loans could be easily frustrated if the DISC is permitted to treat disguised loans to the producer as qualified export assets. A DISC which acts as a commission agent could be a "paper corporation" used solely to "earn" sheltered income in the form of commissions on sales by the producer. If the producer does not pay the commissions which the DISC has earned, the producer would have the unlimited use of the tax-deferred DISC income. In the absence of the challenged regulation, the receivable representing the debt would be a qualified asset. Thus, the DISC could achieve qualified asset treatment of a "loan" which was not subject to the producer's loan limitations. The DISC could meet the 95-percent assets test even though its tax-deferred profits were not applied solely to export activities. Such result contradicts the purpose for which the DISC legislation was enacted.

In considering whether to construe section 993(b)(3) to include commissions receivable owed to the DISC by the related producer, the Commissioner was confronted with this possible circumvention of the producer loan limitation. If "accounts receivable" include only the obligations of unrelated third parties, there was no reason to be concerned about disguised loans, but if such receivables included obligations of a related producer, there existed the possibility that for their own reasons, they might postpone indefinitely the payment of such a receivable and thereby frustrate the producer loan limitation. In light of the potential for frustration of a clear congressional purpose, we cannot hold that the challenged regulation is unreasonable or out of harmony with the origin and purpose of the DISC provisions.

Section 994 deals with the price to be charged in transactions between a related producer and a DISC, and section 994(b) expressly delegates to the Commissioner the authority to issue regulations regarding the amount of the commissions to be charged in transactions between related persons. The Commissioner chose to include the 60-day rule in the regulations under section 994 presumably because those regulations generally deal with transactions between related persons. Even if the regulations cannot be justified under the express grant of regulatory authority contained in section 994(b), they can certainly be justified under the general authority of

section 7805 as a reasonable interpretation of section 993, dealing with what constitutes qualified export assets, and section 994, dealing with transactions between related persons.

In support of their argument that the regulations are unreasonable, the petitioners maintain that the 60-day rule gives them insufficient time to make the necessary computation and payment of the commissions receivable, but we are not convinced by that argument. We have already concluded that the possible frustration of the legislative purpose justifies the issuance of a regulation placing some limitation on the time for the payment of commissions receivable when they are owed by a related producer. We are not convinced that the 60-day period is an unreasonable limitation, especially since the requirement can be satisfied by the payment of an estimate of the amount of the commissions. Accordingly, we conclude that the 60-day requirement is a valid regulation.

We now turn to the petitioners' final argument that the 60-day rule cannot be applied to them retroactively. The DISC provisions (secs. 991–997) were contained in the Revenue Act of 1971, Pub. L. 92–178, 85 Stat. 535. A corporation could qualify as a DISC for any taxable year beginning after December 31, 1971. Sec. 507, Rev. Act of 1971, *supra*, 85 Stat. 553. In January 1972, the Treasury published DISC - A Handbook for Exporters (handbook), containing a "plain language" explanation of the law pertaining to DISCs. The handbook provided that accounts receivable which arose in connection with the DISC's qualified export sale transactions were qualified export assets whether the DISC acted as principal or agent. The handbook did not expressly refer to commissions receivable. The IRS promised that it would follow the rules explained in the handbook until such rules were modified "in regulations or other Treasury publications." The handbook provided that any such modifications adverse to taxpayers would be applied only prospectively. On September 21, 1972, the Commissioner proposed section 1.994–1(e)(3), Income Tax Regs., 37 Fed. Reg. 19625, 19627–19628, and on October 4, 1972, the Commissioner proposed section 1.993–2(d)(2), Income Tax Regs., 37 Fed. Reg. 20853, 20858. These proposed regulations were the first pronouncements concerning the treatment of commissions receivable, and they both

contained the 60-day payment rule. Proposed section 1.994–1(e)(3) was finally adopted on September 29, 1976 (T.D. 7435, 1976–2 C.B. 238) and contained the 60-day rule; proposed section 1.993–2(d)(2) was finally adopted on October 14, 1977 (T.D. 7514, 1977–2 C.B. 266), and incorporated the 60-day rule by reference to section 1.994–1(e)(3). Section 1.993–2(d)(2), Income Tax Regs., was made applicable to taxable years ending after December 31, 1971.

Internal Revenue regulations are retroactive in effect unless the Commissioner provides otherwise. See sec. 7805(b); *Helvering v. Reynolds*, 313 U.S. 428 (1941); *Wilson v. United States*, 588 F.2d 1168 (6th Cir. 1978); *Beneficial Life Insurance Co. v. Commissioner*, 79 T.C. 627 (1982); *Wendland v. Commissioner*, 79 T.C. 355 (1982). The Commissioner's failure to make regulations nonretroactive may not be disturbed unless it amounts to an abuse of discretion.[6] See *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180 (1957); *Wilson v. United States, supra* at 1172; *Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300, 302 (2d Cir. 1971); *Beneficial Life Insurance Co. v. Commissioner, supra.* An abuse of discretion may be found if the retroactive regulation alters settled prior law or policy upon which the taxpayer justifiably relied and if the change causes the taxpayer to suffer inordinate harm. See *Helvering v. R. J. Reynolds Tobacco Co.*, 306 U.S. 110 (1939); *Wilson v. United States, supra* at 1172–1173; *Anderson, Clayton & Co. v. United States*, 562 F.2d 972, 981 (5th Cir. 1977); *International Business Machines Corp. v. United States*, 170 Ct. Cl. 357, 343 F.2d 914 (1965).

The petitioners assert that they relied upon their interpretation of the definition of accounts receivable and upon the promises contained in the handbook. Since International listed

---

[6]Courts have sometimes said that no retroactivity question is even raised upon the application of the first regulations interpreting a statute to events which occurred between the effective date of the statute and the date of the issuance of the regulation. See *Helvering v. Reynolds*, 313 U.S. 428, 433 (1941); *Charbonnet v. United States*, 455 F.2d 1195, 1199–1200 (5th Cir. 1972); *Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300, 303 (2d Cir. 1971); *Uhlenbrock v. Commissioner*, 67 T.C. 818, 821–822 n. 4 (1977). Nevertheless, in considering the validity of the application of first interpretive regulations to taxpayers, courts have reviewed such application for abuse of discretion. *Pollack v. Commissioner*, 392 F.2d 409, 411 (5th Cir. 1968), affg. 47 T.C. 92 (1966); *Caterpillar Tractor Co. v. United States*, 218 Ct. Cl. 517, 524, 589 F.2d 1040, 1043 (1978). Accordingly, we will review the application of the challenged regulation to the petitioners for abuse of discretion.

the commissions receivable as nonqualified assets, not trade receivables, on its DISC returns, we are inclined to doubt this assertion. However, any reliance they may have placed upon the handbook was not justified. It is well settled that Treasury publications such as the handbook, purporting to provide a general explanation of the revenue laws, are simply guides for taxpayers. The statements contained in such publications do not bind the Commissioner in subsequent litigation. See *United States v. New York Telephone Co.*, 644 F.2d 953, 959 n. 10 (2d Cir. 1981); *Caterpillar Tractor Co. v. United States*, 218 Ct. Cl. at 523, 589 F.2d at 1043 (discussing reliance upon the DISC handbook); *Carpenter v. United States*, 495 F.2d 175, 184 (5th Cir. 1974); *Pollack v. Commissioner*, 392 F.2d 409, 411 (5th Cir. 1968), affg. 47 T.C. 92 (1966); *Adler v. Commissioner*, 330 F.2d 91, 93 (9th Cir. 1964), affg. a Memorandum Opinion of this Court; *Green v. Commissioner*, 59 T.C. 456, 458 (1972). Moreover, even if the Commissioner were bound by the "promises" in the handbook, the petitioners have not shown that the Commissioner broke them. The handbook provided that its rules would be followed until modified "in regulations or other Treasury publications." Proposed section 1.993–2(d)(2), Income Tax Regs., containing the 60-day rule, was, at the very least, a subsequent Treasury publication. 37 Fed. Reg. 20853, 20858. This proposed regulation was published before the beginning of the taxable years at issue; thus, this modification of the handbook's provisions was in effect during such years.

Apparently, the petitioners were simply unaware of the proposed regulation. If they had known of such proposed regulation, it would have behooved them to comply with the 60-day rule by paying the commissions receivable or a reasonable estimate thereof. To have done so would have imposed no hardship upon them, and thus, they are not subjected to any inordinate hardship when required to comply with such rule for the years at issue.

The petitioners have failed to demonstrate that the Commissioner abused his discretion in applying the challenged regulation retroactively. The Commissioner's regulatory interpretation did not alter settled prior law. The treatment of commissions receivable remained unclear until the adoption of section 1.993–2(d)(2), Income Tax Regs. In light of the lack of any definitive treatment of commissions receivable, the petitioners

had no "vested interest in a hypothetical decision in * * * [their] favor prior to the advent of the regulations." *Helvering v. Reynolds*, 313 U.S. at 433; *Chock Full O'Nuts Corp. v. United States*, 453 F.2d at 303. Furthermore, the Commissioner made clear in 1972 the position he proposed to take regarding the payment of commissions by a related principal to its agent. The notice of proposed rulemaking, published in the Federal Register, clearly constituted adequate notice to the petitioners. *Wendland v. Commissioner*, 79 T.C. at 382 n. 15. We do not hesitate to apply section 1.993–2(d)(2) retroactively when, as here, the regulation was the first to be issued interpreting section 993(b)(3) and when the regulation was publicly proposed prior to the taxable years at issue. *Charbonnet v. United States*, 455 F.2d 1195, 1199–1200 (5th Cir. 1972); *United States v. Fenix & Scisson, Inc.*, 360 F.2d 260, 267 (10th Cir. 1966); *Wendland v. Commissioner*, 79 T.C. at 382–385.[7]

In conclusion, we hold that sections 1.993–2(d)(2) and 1.994–1(e)(3)(i) of the regulations are valid and that the application of the regulations to the petitioners is valid. Thus, the commissions receivable representing commissions owed to International by Farms on the last day of each of International's taxable years in issue were not qualified export assets since they were not paid within the 60-day period.

*An appropriate order will be issued and decisions will be entered under Rule 155.*

---

[7]See also *Rothfeld v. Commissioner*, T. C. Memo. 1980–362.